1  Elizabeth P. Lin (State Bar No. 174663)     Ronen Sarraf (admitted *pro hac vice*)
   **THE LIN LAW FIRM, APLC**                   Joseph Gentile (admitted *pro hac vice*)
2  2705 S. Diamond Bar Blvd., Suite 398        **SARRAF GENTILE LLP**
   Diamond Bar, CA 91765                        1055 Franklin Avenue, Suite 204
3  Telephone: (909) 595-5522                    Garden City, New York 11530
   Facsimile: (909) 595-5519                    Tel: (516) 699-8890
4  elizabethl@thelinlawfirm.com                 Fax: (516) 699-8968
                                                ronen@sarrafgentile.com
5                                               joseph@sarrafgentile.com
   Mark P. Kindall (State Bar No. 138703)
6  Robert A. Izard (admitted *pro hac vice*)
   Jeffrey S. Nobel (admitted *pro hac vice*)
7  Nicole A. Veno (admitted *pro hac vice*)
   **IZARD NOBEL LLP**
8  29 South Main Street, Suite 305
   West Hartford, CT 06107
9  Telephone: (860) 493-6292
   Facsimile: (860) 493-6290
10 mkindall@izardnobel.com
   rizard@izardnobel.com
11 jnobel@izardnobel.com
   nveno@izardnobel.com
12
13 Attorneys for Plaintiffs

14              **IN THE UNITED STATES DISTRICT COURT**
15              **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

16 JULIE FAGAN, MELISSA                  | Case No.:  5:13-cv-01316-SVW-OP
17 PENNELLATORE, AMY SAPEIKA            |
   and SHELLEY TRINCHERO,               | <u>CLASS ACTION</u>
18 Individually and on Behalf of All Others |
   Similarly Situated,                  | **PLAINTIFFS' SUPPLEMENTAL**
19                                       | **MEMORANDUM REGARDING**
                  Plaintiffs,           | **CLASS CERTIFICATION:**
20                                       | **REDACTED VERSION FOR FILING**
21            v.                         | **ON PUBLIC RECORD**
22                                       |
   NEUTROGENA CORPORATION,              | Judge:  Hon. Stephen V. Wilson
23                                       | Place:  Courtroom 6 – 2nd Floor
              Defendant.                 |          312 N. Spring Street
24
25
26
27
28

1

**TABLE OF CONTENTS**

2

I.     INTRODUCTION ............................................................. 1

3

II.    Plaintiffs' Damages Model Can Calculate Classwide Damages ................... 1

4

5

III.   Plaintiffs' Model is Viable Under *Comcast* .................................... 2

6

IV.    Defendant's Likely Attacks on Weir's Methodology Fail ........................... 4

7

8

       A. Defendant has Endorsed Weir's Data Inputs and
          Methodology ........................................................ 5

9

       B. The Model Correctly Focuses on Label Claims ........................ 8

10

11

       C. The Model Correctly Uses Industry-Standard Weekly Sales
          Data ............................................................... 8

12

13

       D. Weir's Analysis Does Not Depend on Individual Customer
          Information ......................................................... 10

14

15

       E. The Impact of the Natural Claims Was Not Affected by
          Correlation or Collinearity With Other Representations ...................... 11

16

CONCLUSION .................................................................... 11

17

18

19

20

21

22

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

*Brazil v. Dole Packaged Foods, LLC,*
    No. 12–CV–01831–LHK, 2014 WL 2466559 (N.D. Cal. May 30,
    2014).................................................................................................. 2, 10

*In re Cathode Ray Tube Antitirust Litig.,* MDL No. 1917, 2013 WL
    5428139 (N.D. Cal. June 20, 2013) (defendant's motion to strike
    expert testimony), *adopted,* No. C–07–5944–SC, 2013 WL
    5391159 (N.D. Cal. Sept. 24, 2013)................................................................7

*In re Cathode Ray Tube Antitirust Litig.,* MDL No. 1917, 2013 WL
    5429718 (N.D. Cal. June 20, 2013) (class certification*), adopted,*
    No. C–07–5944–SC, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013).........7, 9

*In re Cathode Ray Tube Antitrust Litig.*, C–07–5944–SC,
    2013 WL 5391159 (N.D. Cal. Sept. 24, 2013) .......................................3, 7, 9

*Chavez v. Blue Sky Natural Beverage Co.,*
    268 F.R.D. 365 (N.D. Cal. 2010) ...................................................................3

*Comcast Corp. v. Behrend.,*
    133 S. Ct. 1426 (2013) ........................................................................... 2, 3, 4

*Forcellati v. Hyland's, Inc.,* CV 12-1983-GHK MRWX,
    2014 WL 1410264 (C.D. Cal. Apr. 9, 2014).............................................9, 10

*In re High-Tech Employee Antitrust Litig.,* 289 F.R.D. 555
    (N.D. Cal. 2013) .....................................................................................3, 9-10

*In re High-Tech Employee Antitrust Litig.,* No. 11-CV-02509, 2014 WL
    1351040 (N.D. Cal. Apr. 4, 2014) ..................................................................3

*Leyva v. Medline Industries, Inc.,* 716 F.3d 510 (9th Cir. 2013) ............................2

*McCrary v. Elations Co., LLC,* No. EDCV 13–00242 JGB (OPx),
    2014 WL 1779243 (N.D. Cal. Jan. 13, 2014) ...........................................3, 11

*Rice v. Sunbeam Products, Inc.,* No. 2:12–cv–07923–CAS (AJWx),
    2014 WL 794331 (C.D. Cal. Feb. 24, 2014)...................................................3

*Schramm, et al. v. JPMorgan Chase Bank, N.A.*, No. LA CV09–09442
    JAK (FFMx), 2013 WL 7869379 (C.D. Cal. Dec. 13, 2013) ....................2, 3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Stockwell v. City and County of San Francisco*, 749 F.3d 1107,
    2014 WL 1623736 (9th Cir. Apr. 24, 2014) ..................................................... 4

*Vaccarino v. Midland National Life Ins. Co.,* No. 2:11–cv–05858–
    CAS(MANx), 2014 WL 572365 (C.D. Cal. Feb 3, 2014)................. 4, 7, 8, 9

*Werdebaugh v. Blue Diamond Growers*, No.  12–CV–2724–LHK, 2014
    WL 2191901 (N.D. Cal. May 23, 2014) ........................................ 2, 3, 10, 11

**PLAINTIFFS' SUPPLEMENTAL REPLY REGARDING CLASS CERTIFICATION**

## I.      Introduction

In response to the Court's Order dated June 6, 2014 ("Order") [ECF. No. 113], Plaintiffs submit this Memorandum and the Supplemental Declaration of Colin B. Weir ("Supp. Weir Dec."). Plaintiffs allege consumers paid a price premium for Defendant's sunscreens (the "Products") resulting from Defendant's materially false and misleading "natural" labels. *See, e.g.,* Plaintiffs' Motion for Class Certification ("Plaintiffs' Motion'), [ECF No. 52] at 7 ("the difference between the price paid for the Products and the price that would have been paid if the Products were not labeled as 'natural'"). Weir presents a viable damages model which demonstrates "a price premium that can be fairly attributed to the allegedly misleading labeling." Order at 1. Consequently, Defendant's argument that class-wide damages cannot be established by common proof fails.

## II.     Plaintiffs' Damages Model Can Calculate Class-Wide Damages

In his Supplemental Declaration, Weir calculates damages on a class-wide basis using a hedonic regression, a standard regression analysis taught in undergraduate economics courses. Supp. Weir Dec. at ¶¶6-11; *see also* Declaration of Colin B. Weir ("Weir Decl.") [ECF No. 83] at 4-7; Deposition of Colin Weir [ECF No. 97] ("Weir Dep.") at 60-64, 68, 83-98, 117-118, 147. Weir has performed these regressions numerous times for businesses outside of the litigation context (Weir Dep., 188-89, 192-93),[1] and regression analyses have been widely used in litigation matters. *See* Plaintiffs' Reply in Support of Motion for Class Certification [ECF No. 84], at 6 ("Pl. Reply") (citing cases). Here, Weir compares the attributes of various sunscreen products to isolate and determine the premium charged as a result of Defendant's natural misrepresentations. Supp.

---

[1]   Contrary to Defendant's argument, the fact that hedonic regressions are performed in the business world outside of the litigation context should give the methodology more, not less, weight.

1

Weir. Decl. at ¶¶15-17, 49-59 & Exhibit 3; *see also* Weir Dep. at 19-20, 22-23, 72-80, 99-105, 165-166, 168-71.   This type of regression properly measures class-wide damages in a case like this in that it isolates the effect of the misrepresentation on price by controlling for other factors.   *Brazil v. Dole Packaged Foods, LLC*, No. 12–CV–01831–LHK, 2014 WL 2466559, at **15, 17 (N.D. Cal. May 30, 2014); *Werdebaugh v. Blue Diamond Growers*, No.   12–CV–2724–LHK, 2014 WL 2191901, at *24 (N.D. Cal. May 23, 2014).

The data inputs to Weir's model are both well-supported and common to the class: products identified by Neutrogena as competitors, product attributes Neutrogena considers to have an impact on price and price data obtained from the same market research company relied upon by Neutrogena's expert, Dr. Keith Ugone.   Supp. Weir. Decl. at ¶5.   With these data, Weir was able to make a preliminary determination that the Products commanded a 19.96% higher price than they would have if the misleading "natural" claims were not on their labels, resulting in class-wide damages to a class of California consumers during the 2009-2014 period of $1.9 Million. *Id.* at ¶¶3, 49, 76-77.

## III.    Plaintiffs' Model Is Viable Under *Comcast*

Under *Comcast v. Behrend*, 133 S. Ct. 1426 (2013)*,* Plaintiffs "must be able to show that their damages stemmed from defendant's actions that created the legal liability."   *Leyva v. Medline Industries, Inc.,* 716 F.3d 510, 514 (9th Cir. 2013).   Accordingly, their "damages model must be sufficiently tailored to the class-wide theory of liability that they have advanced."   *Schramm, et al. v. JPMorgan Chase Bank, N.A.*, No. LA CV09–09442 JAK (FFMx), 2013 WL 7869379, at *4 (C.D. Cal. Dec. 13, 2013).   In a case based on misrepresentations, the model should be structured to reimburse plaintiffs based on the precise misrepresentations that form the basis of the claim.   *Id.*   In a case alleging a "natural" misrepresentation, plaintiffs "must present a methodology that can determine the price premium

2

attributable to" the natural misrepresentation.  *Werdebaugh,* 2014 WL 2191901, at *22.

However, "*Comcast* did **not** alter the evidentiary requirements for class certification." *Schramm,* 2013 WL 7869379, at *6 (emphasis added).  Accordingly, "'[a]t class certification, plaintiff must present a likely method for determining class damages, though it is not necessary to show that [this] method will work with certainty at this time.'"  *McCrary v. Elations., LLC*, No. 13-00242 JGB OP, 2014 WL 1779243, at *15 (C.D. Cal. Jan. 13, 2014) (citing *Chavez v. Blue Sky Natural Beverage Co.,* 268 F.R.D. 365, 379 (N.D. Cal. 2010)); *see* Plaintiffs' Supplemental Reply Regarding Class Certification ("Pl. Supp. Reply") [ECF No. 112] at 3 and fn 3.  Plaintiffs also do not need to show that their damages *calculation* is correct. *Rice v. Sunbeam Products, Inc.*, No. 2:12–cv–07923–CAS(AJWx), 2014 WL 794331 (C.D. Cal. Feb. 24, 2014).  Rather, Plaintiffs need only present a workable *means* for calculating damages.  *Werdebaugh,* 2014 WL 2191901, at *25-26.

Thus, where Plaintiffs propose a regression analysis as a damages model, Plaintiffs need only present a regression that is "'a plausible methodology for showing generalized harm to the Class as well as estimating class wide damages' despite defendants' criticisms regarding the model's design and sensitivity."  *Id.* at *25, *quoting In re High-Tech Employee Antitrust Litig.*, 289 F.R.D. 555, 582 (N.D. Cal. 2013).  The issue for the Court is the viability of the model as a means to calculate class-wide damages, not the merits of the regression analysis itself.  *In re Cathode Ray Tube Antitrust Litig.*, No. C–07–5944–SC, 2013 WL 5391159, at *6 (N.D. Cal. Sept. 24, 2013).  Consequently, *Comcast* also does not require that the model present an "exact calculation" of damages. *Id.* at * 7.  Nor does it hold that a model must precisely segregate out every possible factor unrelated to plaintiff's claims.  *In re High-Tech Employee Antitrust Litig.,* No. 11-CV-02509, 2014 WL 1351040 *18 (N.D. Cal. Apr. 4, 2014).  Indeed, such precision is not even required

3

for either an individual or a class to establish damages at trial. *Vaccarino v. Midland National Life Ins. Co.,* No. 2:11–cv–05858–CAS(MANx), 2014 WL 572365 *11 (C.D. Cal. Feb 3, 2014) (noting that *Comcast* did not alter the substantive legal standard that "damages may be computed even if the result reached is an approximation;" plaintiffs are only required to introduce the "best evidence" "of which the nature of the case is capable," and Defendants cannot "complain that the amount [of damages] cannot be determined with mathematical precision."). And, since the issue is only whether common issues predominate, the Court should not attempt to resolve merits issues like disagreements over what the measurement of damages should be or whether Plaintiffs will ultimately prove their damages. *Id.*

## IV.    Defendant's Likely Attacks on Weir's Methodology Fail

While Plaintiffs cannot anticipate all of Defendant's challenges to Weir's analysis, Weir's model disposes of several arguments previously raised by Defendant. Plaintiffs expect that many will be irrelevant, as the only issue before the Court is the viability of the model as a means to determine class-wide injury and damages. *See also,* Pl. Supp. Reply at 5-6. discussing *Stockwell v. City and County of San Francisco*, 749 F.3d 1107, 2014 WL 1623736, at *7 (9th Cir. Apr. 24, 2014).

Although Defendant's expert, Keith Ugone, was well aware that Weir proposed to use a hedonic regression when he submitted his prior declaration, Reply Declaration of Keith Ugone ("Ugone Reply Decl.")[ECF No. 92], his past criticisms of that methodology are baseless. Pl. Supp. Reply at 5.[2] To the extent

---

[2] As Ugone's prior Reply Declaration was based on mischaracterizations of Weir's opinions and erroneous assumptions and analyses, Plaintiffs presume that Weir will have responses to whatever arguments Ugone creates for his future response. Although the Court did not provide for any further response from Plaintiffs, to the

4

that Ugone again raises the same arguments, Plaintiffs respectfully refer the Court to their prior filing. Pl. Supp. Reply at 6-10.[3]

## A. Defendant Has Endorsed Weir's Data Inputs and Methodology

In his earlier declaration, Ugone claimed that Weir could not identify explanatory product attributes that would affect the price of the Products. Ugone Reply Decl. at 22-23. However, Weir is using the very attributes that Neutrogena believes are material. Supp. Weir Decl. at ¶¶5, 21,60.[4] Similarly, although Ugone argued that Weir failed to identify competitive products (Ugone Reply Decl. at 27-28), Weir is using the very products that Neutrogena considers competitive (Supp. Weir Decl. at ¶¶5, 21-30, 60).[5] Finally, Ugone claimed that Weir has not identified the available necessary data. Ugone Reply Decl. at 21-22. But Weir is using the

_____

extent the Court has questions or concerns, Plaintiffs look forward to responding either through a supplemental filing or at oral argument, as the Court may direct.

[3] These might include, for example, the erroneous argument that Plaintiffs need to establish an efficient market.

[4] On June 4, 2014, Plaintiffs requested all documents related to product attributes "that Defendant (or any expert retained by Defendant) believes or contends is material to reasonable consumers or to the price paid" by reasonable consumers. The parties agreed on June 10, 2014, that Defendant would simply produce a list of all product attributes that it deemed relevant, and Defendant "represent[ed] that we will not contend that any additional attributes are material to a reasonable consumer's purchasing decisions or to the price paid . . . ." Defendant produced its list on July 2, 2014. Weir considered all of the specific attributes listed by Defendant in conducting his analysis (although he concluded that some attributes should not be included in the regression). *See* Supp. Weir Decl. at ¶¶36-48. Defendant also included a "catch-all," asserting that "[c]laims (current and historical) made on the labels" should be considered as one of the relevant product attributes. This catch-all is facially contrary to the parties' agreement that Defendant would provide specific, concrete attributes that it claimed Plaintiff must analyze, and so was not included in Weir's analysis.

[5] Pursuant to the parties' agreement, Defendant provided a list of products that it considered to be competitive on July 2, 2014.

5

same IRI data that Ugone used, which is customarily used in the industry.  Supp. Weir Decl. at ¶¶5, 61; *see also* Declaration of Keith Ugone ("Ugone Decl.") [ECF No. 73] 14, 41-55, 61-77.

Moreover, Weir is applying the methodology Ugone endorsed.  Ugone states that determining the premium attributable to the "natural" misrepresentations involves three steps.  Ugone Decl. at 56-57.  The first is selection of appropriate benchmark products.   Just as Ugone did (*id.* at 56, 59-60), Weir selected as benchmark products those identified as Defendant as competing products.  Supp. Weir Decl. at ¶¶5, 21-30, 60.   The second step is calculation of the price differences between the products.  Like Ugone (Ugone Decl. at 61-62), Weir used IRI data. Supp. Weir Decl. at ¶5, 61.[6]  Finally, Ugone states that the third step is apportioning the price difference attributable to the "natural" misrepresentation.  Ugone Decl. at 66-70.  Weir satisfied this step through his regression of the very attributes that Defendant itself believes affect the price of sunscreens.[7]

Even if Defendant raised legitimate questions about particular inputs into the model – which it has not – questions about what the model should account for or contain and who is ultimately right or wrong are *merits* questions that are *not*

---

[6]   Moreover, Weir explains that the results of his regression takes into account sales promotions and package size.  *See* Supp. Weir Decl. at ¶¶31-36.

[7] [


**CONFIDENTIAL INFORMATION REDACTED**


]

part of the class certification inquiry.  *Vaccarino,* 2014 WL 572365, at *12.  In particular, "the selection of data is plainly a matter within the judgment of an expert.  While different experts might disagree on data selection, that does not call into question the methodology used."  *In re Cathode Ray Tube Antitirust Litig.*, MDL No. 1917, 2013 WL 5428139, at *10 (N.D. Cal. June 20, 2013) (defendant's motion to strike expert testimony), *adopted,* No. C–07–5944–SC, 2013 WL 5391159, at * 6, 9 (N.D. Cal. Sept. 24, 2013).  Accordingly, disputes over data selection involve a battle of the experts to be decided by a jury, not a dispute over methodology to be determined at class certification.  *In re Cathode Ray Tube Antitirust Litig.*, 2013 WL 5391159, at *8.  Similarly, disputes over expert assumptions, credibility and contrary expert evidence concern the weight of an opinion, not the reliability of a methodology, and should not be considered on class certification.  *Id.* at *9.  Accordingly, the Court need not resolve disputes over whether all of the proper variables have been captured in the regression model or which expert is the most credible or has the better regression.  *In re Cathode Ray Tube Antitirust Litig.*, MDL No. 1917, 2013 WL 5429718, at *21-22 (N.D. Cal. June 20, 2013) (class certification), *adopted,* 2013 WL 5391159, at *6, 9.

Indeed, all of the data to be input into the model does not need to be and cannot be determined at this time.  *Vaccarino,* 2014 WL 572365, at *13 and fn 8.  Here, the Court allowed two months for Plaintiffs to present a workable model.  Plaintiffs have done that, and additionally have actually run the model based on sales data from IRI and information on product attributes that they have obtained from public sources such as competitor product labels and websites.  The results of the model as it currently stands are statistically robust.  Weir Supp. Decl. at ¶52.  That being said, as discovery continues, Plaintiffs will continue to obtain more data inputs.  For example, Plaintiffs will subpoena the manufacturers of the competing products to obtain product label images for additional sunscreens that competed

7

with Defendant's Products during the Class Period.  Accordingly, as the case proceeds, more data may make the model more robust.  The results of the model will not necessarily be "finished" until all of the facts have come out and all factual disputes are resolved.  Indeed, it would be impossible for the results of the model to be finalized until the facts are determined at trial.  *Vaccarino,* 2014 WL 572365, at *13 and fn 8.  All that matters at this stage is that the class-wide damages model is capable of modification as these facts are determined. *Id.*[8]

## B.  The Model Correctly Focuses on Label Claims

Defendant may also improperly object that Weir's analysis is based solely upon Product attributes listed directly on the actual Product labels (and does not include, for example, attributes listed only on websites or other advertising). Ugone Decl. at 31.  However, the entire purpose of a product label is to list the relevant attributes that will induce a customer to make a purchase (and thus that impact and/or justify the product price).  Moreover, every consumer has access to the product label at the time he or she makes a purchase decision, and the label constitutes the manufacturer's final opportunity to "sell" the consumer on the product's salient characteristics.  Accordingly, it is proper to consider only the attributes listed on the product label in evaluating the price premium that consumers are willing to pay for those attributes.

## C. The Model Correctly Uses Industry-Standard Weekly Sales Data

Any attack on Weir's analysis based upon his use of industry-standard IRI weekly sales data is also without merit.  The IRI data consists of actual sales information in the state of California collated by week of purchase.  This data is

---

[8]   Similarly, to the extent that Defendant identifies any coding attributes in the product data considered in Weir's regression, such data can easily be corrected and the model re-run.  *See* Supp. Weir Decl. at ¶¶62-63.  The fact that individual data inputs may change does not undermine the robustness of the fundamental mathematical model.

appropriate for numerous reasons.  Ugone acknowledges that data need only be broken down by "geography (eg. city or county) [or] time period (eg. week or year of purchase)."  Ugone Reply Decl. at 18.  The model accounts for these variations. (Supp. Weir Decl. at ¶¶69-71, 75) and courts commonly accept averages of actual retail prices (such as in the IRI data) for class damages analyses.  *In re Cathode Ray Tube Antitrust Litig.*, 2013 WL 5429718, at  *20-22; *In re Cathode Ray Tube Antitrust Litig.*, 2013 WL 5391159, at *8.[9]  This is particularly appropriate here where, as discussed above, Plaintiffs need present only a reasonable approximation of damages.  *Vaccarino,* 2014 WL 572365, at *11.  Moreover, the aggregated IRI data will result in a precise determination of the aggregate class-wide damages for which *Defendant* is potentially liable.  Even if the averaging could have a minor impact on the precise recovery of each individual class member, it has no impact on class certification, where the issue for the Court is whether plaintiff has a methodology for establishing *class-wide* damages, not allocation of damages to individual class members.  Indeed, Defendant has no due process right at all in the allocation of damages among class members.  *Forcellati v. Highlands, Inc.*, No. CV 12–1983–GHK (MRWx), 2014 WL 1410264 **5-6 (C.D. Cal. April 9, 2014). For example, in *In re High-Tech Employee Antitrust Litig.*, 289 F.R.D. at 577, 579, 582, the court found appropriate a damages model that calculated the aggregate

---

[9] [

## CONFIDENTIAL INFORMATION DELETED

] Pricing across sales channels is accounted for in the dataset through the use of weighted averages, which gives greater weight to sales channels with higher sales volumes. *Id.* at ¶61, n. 16.

9

amount that each Defendant undercompensated its employees even though it did not estimate the damages of each individual class member.[10]

**D. Weir's Analysis Does Not Depend on Individual Customer Information**

Contrary to Defendant's argument (Sur-Reply at 6-7; Ugone Reply Decl. at 7, 9, 11, 18, and 30-31), customers' individual reasons for buying the Products have no bearing on the price premium and are irrelevant to Weir's damages analysis. Prices and price premiums (and the resulting damages) are determined by retail prices regardless of customer motivations. Supp. Weir. Decl. at ¶¶66-68, 74; Weir Dep. at 31,51,57,107-10, 130-32, 149, 166-67. Simply put, consumers and retailers do not individually negotiate sunscreen prices based on consumer motivations or other factors. For the same reason, Defendant's argument that Weir's model does not distinguish between consumers who were and were not

---

[10] Allocation of classwide damages can be accomplished by applying the model-calculated premium percentage to the Product purchases made by each class member filing a simple claim form. Even if class members do not have actual receipts of their Product purchases, they are likely to recall them, since a tube of sunscreen is a health and beauty item that is purchased intentionally only once or twice a year. For example, Plaintiff Pennellatore bought the Product Memorial Day weekend, 2013, on Cape Cod (Pennellatore Tr. at 33-34); Fagan bought at Walgreens in Lake Tahoe, Los Altos, Sunnyvale and Mountain View in 2012 and 2013 (Fagan Tr. at 43-44, 52-54); Trinchero bought at either a CVS or Rite Aid in Capitola in September, 2011(Trinchero at 35-37); Sapieka purchased at Target in 2012 and May, 2013. (Sapieka Tr. at 13-18). Accordingly, Class members will likely remember sufficient information to submit a proof of claim form. Courts routinely certify classes of purchasers of products that are less likely to be recalled by class members in filling out proof of claim forms than Defendant's sunscreen Products. *Brazil*, 2014 WL 2466559 *1 (eight fruit products); *Werdebaugh*, 2014 WL 2191901, at *2 (a variety of almond milk products). And, from the perspective of consumer recall, there is no material difference between the Products and the homeopathic cold and flu remedies at issue in *Forcellati,* 2014 WL 1410264, at *1, 7-8.

misled by the natural misrepresentations fails.  Sur-reply at 8, bullet one.  Weir's analysis correctly focuses on "the difference between the market price actually paid by consumers and the true market price that reflects the impact of the unlawful, unfair or fraudulent business practice."  *Werdebaugh,* 2014 WL 2191901, at *22.  Every Class Member paid this premium, regardless of whether he was misled.[11]

### E. The Impact of the Natural Claims Was Not Affected by Correlation or Collinearity With Other Representations

Defendant's argument that Weir would be unable to determine the value of the natural misrepresentations if they are correlated or collinear with other variables (Ugone Reply Decl. at 28-30) fails.  Weir found no evidence that the model results for the "natural" attribute were affected by any correlation or collinearity with other product attributes.  Suppl. Weir Decl., at ¶¶49-59.  Indeed, even the data produced by Ugone reveals no incidence of multicollinearity between the "natural" claims at issue in this litigation and other product attributes such as brand, SPF, or physical/chemical.

### CONCLUSION

Plaintiffs have established a proper methodology for calculating class-wide damages.  Accordingly, Plaintiffs respectfully request the Court certify the classes described in their Motion for Class Certification, appoint them as class

---

[11] In other words, even class members who were "happy" with the misrepresented product suffered an economic loss because they purchased the product bearing the alleged misrepresentation.  In *McCrary*, 2014 WL 1779243, at *42-45, the court found that where a misrepresentation to the entire class is likely to deceive the public under objective criteria, then reliance is presumed and no individualized determination is required.  *Id*. at 14-15.  Consequently, the "Court need not examine whether each putative class member was unsatisfied with the product in order to find that common issues predominate" because the focus of the claim is on the Defendant, "not on the subjective state of mind of the class members."  *Id*. at 14; *see also Werdebaugh,*  2014 WL 2191901, at *16-17.

---

representatives, and appoint Lead and Liaison Class Counsel as indicated in the proposed order submitted with their Motion.

Dated:  August 4, 2014

Respectfully submitted,


By:  */s/  Mark P. Kindall*
Robert A. Izard (admitted *pro hac vice*)
Jeffrey S. Nobel (admitted *pro hac vice*)
Mark P. Kindall (State Bar No. 138703)
Nicole A. Veno (admitted *pro hac vice*)
**IZARD NOBEL LLP**
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone: (860) 493-6292
Facsimile: (860) 493-6290
jnobel@izardnobel.com
mkindall@izardnobel.com
rizard@izardnobel.com
nveno@izardnobel.com

Elizabeth P. Lin (State Bar No. 174663)
**THE LIN LAW FIRM, APLC**
2705 S. Diamond Bar Blvd., Suite 398
Diamond Bar, CA 91765
Telephone: (909) 595-5522
Facsimile: (909) 595-5519
elizabethl@thelinlawfirm.com

12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Ronen Sarraf (admitted *pro hac vice*)
Joseph Gentile (admitted *pro hac vice*)
**SARRAF GENTILE LLP**
1055 Franklin Avenue, Suite 204
Garden City, New York 11530
Tel: (516) 699-8890
Fax: (516) 699-8968
ronen@sarrafgentile.com
joseph@sarrafgentile.com

Attorneys for Plaintiffs JULIE FAGAN,
MELISSA PENNLLATORE, AMY SAPEIKA
and SHELLEY TRINCHERO, Individually and on
Behalf of All Others similarly Situated

13

PLAINTIFFS' SUPPLEMENTAL REPLY REGARDING CLASS CERTIFICATION