1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                  WESTERN DIVISION

4     THE HON. JUDGE STEPHEN V. WILSON, JUDGE PRESIDING

5

6   JULIE FAGAN, et al.,              )
                                      )
7                 Plaintiff,          )
                                      )
8        vs.                          ) NO. EDCV-13-01316-SVW
                                      )
9   NEUTROGENA CORPORATION,           )
                                      )
10                Defendant.          )
    _____)

11

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                 Los Angeles, California

16                 Monday, June 2, 2014

17

18

19

20

21

22          LISA M. GONZALEZ, CSR No. 5920, CCRR
                 U.S. District Courthouse
23          312 North Spring Street – Room 438
               Los Angeles, California 90012
24                   213.894.2979
                 www.lisamariecsr.com
25

```
 1    APPEARANCES:

 2

 3    FOR THE PLAINTIFF:    IZARD NOBEL LLP
                            BY:  ROBERT A. IZARD
 4                          29 South Main Street
                            Suite 305
 5                          West Hartford, CT  06107
                            860-493-6295
 6

 7
      FOR THE DEFENDANT:    KRAMER, LEVIN, NAFTALIS & FRANKEL LLP
 8                          BY:  HAROLD P. WEINBERGER
                            and EILEEN M. PATT
 9                          1177 Avenue of the Americas
                            New York, NY  10036
10                          212-715-9347

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              Los Angeles, California, Monday, June 2, 2014;

 2                           2:10 p.m.

 3                            -o0o-

 4         THE CLERK:  Calling item number 9, CV-13-1316-SVW,

 5  Julie Fagan, et al., versus Neutrogena Corporation.

 6         Counsel, please state your appearance.

 7         MR. IZARD:  Good afternoon, Your Honor.  Robert

 8  Izard for the plaintiffs.

 9         MR. WEINBERGER:  For the defendants Harold

10  Weinberger and Eileen Patt.

11         THE COURT:  Let me first hear from the defendant

12  on the -- on its contention that the expert testimony on the

13  survey evidence is deficient.

14         MR. WEINBERGER:  Your Honor, the primary ground

15  for that motion is the fact that the expert witness did not

16  test the advertising at issue, which is a cornerstone

17  requirement.  Your Honor -- in fact, when Your Honor denied

18  our motion to dismiss, one of the issues you may recall was

19  the ingredient list that was on the back and Your Honor said

20  the issue in the case is whether the label as a whole is

21  misleading.

22         What this expert witness did was to take the

23  statement on the front of the label, the one that says 100

24  percent naturally sourced sunscreen ingredients or some of

25  them say --
```

1          THE COURT:  I'm aware of that argument, and when a

2     court has to rule on a motion to dismiss it's a different

3     standard than what the court confronts now, but the

4     plaintiffs' expert says that there is reliable evidence that

5     most people just look at the front of a package to determine

6     whether to buy it or not.  And the front of the label, it

7     has reiterations but the iteration that is sort of common is

8     "all natural ingredients."

9          MR. WEINBERGER:  Right.  Well, she says that but

10    there was no -- nothing in her survey or no evidence at all.

11    She just said that.

12         THE COURT:  That's what I want to get to.

13         So that seems very foundational to the opinion;

14    and is it your view that the plaintiffs' expert has not

15    buttressed that conclusion?

16         MR. WEINBERGER:  She certainly hasn't.  And -- she

17    certainly has not.  In fact, she herself said that this --

18    this survey is what she called a "generic inquiry."  It does

19    not address the particular products at issue in the

20    litigation and, as such, it's just not relevant to the case;

21    but you're right, she did say that, but she didn't support

22    it with anything.  She certainly didn't --

23         THE COURT:  But that's -- that's the question

24    because the expert testimony is now focused under the --

25    under the Daubert analysis.

```
 1            So sometimes an expert is allowed to opine, even
 2   in a conclusory way, if experts of that kind would generally
 3   be allowed to make that kind of conclusion.
 4            So now you have a market -- a marketing expert and
 5   that marketing expert essentially is saying, to follow your
 6   argument, it's well known that people just look at the front
 7   of packages in determining whether to -- front labels in
 8   determining whether to buy the product, and you're saying
 9   that -- you're questioning that.
10            MR. WEINBERGER:  Yeah.  She didn't cite any
11   literature; she didn't cite any surveys.  In fact this is
12   something that can be empirically tested.  It's not
13   something that can't be tested, and she didn't test it.
14            So to just say, "Well, I think most people look at
15   the front of the labels" and to base her whole opinion on a
16   survey that is essentially predicated on that fact, we think
17   just doesn't meet the -- doesn't meet the test of Daubert.
18            I will add there are also a myriad of other
19   problems, and we would not have made the motion if it was
20   solely based on the methodological problems, but when you
21   combine that with --
22            THE COURT:  I want to stay with the methodological
23   problems first, and then we can shift to the liability or
24   other facets of Daubert.
25            But isn't the plaintiffs' expert also saying, that
```

1  even if someone looked at the backside of the label and saw

2  the list of compounds, that they wouldn't know whether those

3  were natural?

4          MR. WEINBERGER:  No, she did not render that

5  opinion.

6          THE COURT:  I see.

7          MR. WEINBERGER:  That's an argument that the

8  plaintiffs have made.  She did not render that opinion.

9          THE COURT:  I see.

10          Well, let's just stay with that for a moment.  Let

11  me get the response, and then we'll go on to another

12  question.

13          MR. IZARD:  Good afternoon, Your Honor.  Robert

14  Izard.

15          A couple of points.  First, we're on a motion for

16  class certification and I would commend to the court the

17  cases cited in footnotes 3 and 5 of the reply to our motion

18  for class certification.  In particular, the *Johnson* case

19  and the *Weiner* case, which are out of this district.

20          And those cases held that the key for class

21  certification is to look at the challenged words, and that a

22  class may be certified notwithstanding surrounding --

23  surrounding verbiage, such as if the challenged words are on

24  a TV ad, or in different iterations of the public

25  advertising.

```
 1              The second thing I would commend to the court is
 2    the declaration of Nicole Veno, who's an attorney in our
 3    office and, in particular, Exhibit G -- and there's Bates
 4    numbers on there -- and the Bates numbers 149 to 152 and
 5    154.  These are Neutrogena documents that talk about the
 6    impact of the challenged words and how the challenged words
 7    are the main drivers.  There's not an analysis of the
 8    advertising package as a whole, it's an analysis of the
 9    challenged words.
10              The third thing --
11              THE COURT:  What about that analysis?  What does
12    that analysis conclude that favors your view?
13              MR. IZARD:  Your Honor, if I could just get my
14    paper --
15              THE COURT:  Yes.
16              MR. IZARD:  I look at Exhibit G and the Bates
17    number is N0000154.  In the bottom-right corner, it says
18    "key likes," and there's three key likes here.  One is, "I
19    like that it doesn't have a lot of extra chemicals and would
20    be gentle on the baby's skin."  The second key like is, "I
21    like that it has an SPF of 60, and that it is all natural."
22    The third key like is, "No chemicals.  Easy on the skin."
23              THE COURT:  So these likes, what is the context of
24    that?
25              MR. IZARD:  This is a Neutrogena survey of
```

1  consumers or some type of survey Neutrogena did.  We have

2  not dug behind it, but this is a document Neutrogena

3  produced.

4           And the box up above it says, "The main drivers of

5  interest are 100 percent naturally sourced sunscreens and

6  hypo-allergenic oil free, fragrance-free."

7           In another exhibit, Exhibit E to the Veno

8  declaration --

9           THE COURT:  How does that answer the -- the

10  question that I raised with Neutrogena's counsel regarding

11  the expert's conclusion that consumers just read, for the

12  most part, the front labels?

13           MR. IZARD:  Well, she does say, and it's her

14  experience and she's done many hundreds of these surveys,

15  that consumers do just look at the front label.

16           And I also think as a matter of law we have the

17  Ninth Circuit *Williams*' case where the Ninth Circuit found

18  that qualifying language on the back label does not cure an

19  improper statement on the front label.

20           So I think those two working together say that --

21           THE COURT:  Well, I'm not focused for the moment

22  on anything other than the argument that was made by

23  counsel, and that was that there is an essential deficiency

24  in the expert regarding the -- her conclusion that people

25  just read the front label.

1          In other words, the argument you're making to me

2    sounds like you don't really need an expert.

3          In other words, let's say there wasn't an expert.

4    Your position seems to be, and you say it's supported by

5    case law, the label says, to the average consumer, "all

6    natural ingredients."  It doesn't have all natural

7    ingredients.  Even the defendant concedes that it has,

8    perhaps, all natural active ingredients.  You could argue

9    that's -- that's a distinction.  And then you would say case

10   law supports your view that, even if the average consumer

11   knew that all those multi-syllabic compounds on the back of

12   the product were not natural compounds, not natural

13   elements, it doesn't save the plaintiff because it's a

14   question of fact as to whether people read the back or not;

15   correct?

16          MR. IZARD:  Well, it is also a question of fact is

17   even if you read the back, you would know what that stuff

18   is.  Even defendants' employee who we deposed wasn't sure --

19          THE COURT:  How do you get to the -- to the --

20   defendant makes arguments about other aspects of Rule 23 but

21   to me the most significant argument deals with commonality.

22          MR. IZARD:  Right.

23          THE COURT:  So if -- if -- assume that the front

24   of the label is misleading and assume that if one read the

25   front of the label and the back of the label, some people

1    would not be misled because there are some people who would

2    know that these compounds are not natural ingredients.

3           So how does that resolve itself into a common

4    question?

5           In other words, there are some who would be

6    deceived by the front, some who would read the front and the

7    back -- that's where this issue of how many would read the

8    front and the back comes into play -- and then those who

9    read the back who would not be misled by what's on the

10   front.

11          Aren't there different groups of consumers here?

12   How does it come onto the -- under the umbrella of one

13   class?

14          MR. IZARD:  Your Honor, the -- the reason is that

15   materiality, if you will, that's what we're really talking

16   about here, I think, is an objective standard.  Whether the

17   reasonable consumer would be misled.

18          And so it's our position that the reasonable

19   consumer would be misled because the front says "sunscreen."

20   That's the noun that defines what's in the tube, and it says

21   "naturally sourced."  Sometimes it's 100 percent, sometimes

22   there's not, but it says "naturally sourced."  And it's our

23   position that the reasonable consumer would be misled by a

24   naturally sourced sunscreen representation when there are

25   chemicals in there.  And we think that's supported both

```
 1    by --

 2              THE COURT:  I agree with you that there are some

 3    who would be.  What I'm trying to focus on is how do some --

 4    50, 40, 30, 80 percent -- become -- how does everyone who

 5    bought Neutrogena become a member of the class?

 6              MR. IZARD:  Because everybody -- the price is not

 7    set in individual one-on-one transactions.  It's a market

 8    price, and the price is set based on the market -- I mean

 9    natural product --

10              THE COURT:  I see.  Then what you are saying is

11    that even if I bought Neutrogena and I wasn't deceived about

12    the all natural ingredients or not because that wasn't

13    important to me, I still paid more for Neutrogena than I

14    would have because Neutrogena priced that natural ingredient

15    differential into the product?

16              MR. IZARD:  That's --

17              THE COURT:  So you're then saying that the class

18    can include people who weren't deceived?

19              MR. IZARD:  Your Honor, the test isn't deception

20    on a person-by-person basis, the test for liability is

21    whether the reasonable consumer would be misled.  That's the

22    standard -- the case law standard; so it's an objective

23    standard.

24              And there was a case that just came down a couple

25    of days ago, the *Werdebaugh v. Blue Diamond* case out of the
```

1    Northern District that I think has a good discussion of

2    this.

3           So, yeah, the reasons classes are certified on

4    these types of cases -- because if you had to go through

5    person by person and ask them what did you personally

6    understand this label to mean, no class would ever be

7    certified, obviously, and so that issue is resolved --

8           THE COURT:  But I'm not reducing it to a

9    consumer-by-consumer analysis, I'm in full agreement with

10   you that that isn't the proper approach.  But if there are

11   consumers who would not be deceived, who would read the back

12   of the label -- that's what the defendants seem to be

13   arguing -- how can you include all of those in one class?  I

14   mean don't you have to perhaps redefine the class?

15          MR. IZARD:  I think not, Your Honor, because if

16   they knew that the product was not natural and they bought

17   it anyway, then it was not an issue for them.  If they knew

18   it was not natural and they cared, then they wouldn't have

19   bought it and they wouldn't be in the class.

20          But the people that went ahead and bought it

21   anyway -- say this was the only sunscreen in the store.

22   They had no other choice.  Their kid was, you know, sitting

23   at the beach roasting away, they still paid a premium, and

24   that's what -- what the methodology of our expert will

25   demonstrate.  They paid a premium for whatever reason they

1    bought it, because their personal motivations don't matter.

2    If they fall within --

3           THE COURT:  See, I understand that -- that price

4    premium theory, and my concern is in some ways it swallows

5    up the commonality aspect of class actions.

6           MR. IZARD:  I don't think so because I think the

7    objective standard is what takes care of that, and I think

8    that's --

9           THE COURT:  All right.

10          MR. IZARD:  -- what a number of the cases in our

11   brief say.

12          THE COURT:  I see.  All right.  Go on with your --

13   thank you, sir.

14          We wanted to go forward with some of your other --

15          MR. WEINBERGER:  Still just talking about the

16   expert, or should I address the Rule 23 -- the Rule 23

17   motion as well?

18          THE COURT:  No, I'm just talking about the expert.

19          MR. WEINBERGER:  Okay.  So, in addition,

20   Your Honor, to the -- what we believe is the main problem,

21   the expert here purported to rely on Sherrie Diamond's

22   article, which Your Honor's probably familiar with.  It's in

23   the --

24          THE COURT:  Yes.

25          MR. WEINBERGER:  -- federal manual.  As it turns

```
 1   out, she violated every -- every single rule under the sun.

 2   It is -- it is pretty much doctrine now that you can't do a

 3   survey without a control because you have to understand what

 4   people are bringing to the survey.  Are they bringing

 5   pre-existing beliefs?  Are they paying attention?  There are

 6   a variety of ways --

 7           THE COURT:  What is -- we're talking now about the

 8   questions that were asked; is that correct?

 9           MR. WEINBERGER:  Yes.

10           THE COURT:  So get into some detail with me on

11   that.

12           MR. WEINBERGER:  Well, for example, she asked

13   questions like, "If you had one -- one sunscreen that said

14   this and another one that didn't and one cost five cents and

15   the other cost a dollar" -- I'm just making up the

16   numbers --

17           THE COURT:  She doesn't use natural ingredients.

18   She just uses --

19           MR. WEINBERGER:  Yes.  One says naturally sourced

20   sunscreen ingredients and the other doesn't and one costs

21   $20 and the other costs 5, which one would you buy?  The

22   price has nothing to do with what she was getting at.

23           And the reason -- and there were other questions

24   that were extremely leading, "If you knew this product

25   contained toxic substances, would you buy it?"  That kind of
```

```
 1    thing.  That's not what this case is about.  This product

 2    doesn't contain --

 3          THE COURT:  Well, didn't she ask any questions

 4    that were within the ambit of relevance?

 5          MR. WEINBERGER:  Yeah.  I mean she would -- she

 6    asked them, for example, "If you saw a sunscreen that said

 7    naturally sourced sunscreen ingredients, would you believe

 8    that it was all natural?" that kind of question.  But the

 9    reason to ask for a control, the reason you have to have

10    controls in these cases is to make sure that the information

11    that people give you -- gives back in response to those

12    questions are in fact in response to those questions and not

13    something that they may have brought to the table.

14          This is very, very well established now in the law

15    that you need to do that.  There are a lot of ways to do it.

16    You give someone an ad that doesn't contain the offending

17    language, you ask the same questions.  At a very minimum,

18    you have to give someone some questions to make sure they're

19    paying attention.  Ask them about something that has nothing

20    to do with the issue that's covered by the survey.  She

21    didn't do any of it.  Nothing.  No controls at all.

22          THE COURT:  What should she have done?  By asking,

23    "Would it make a difference to you if the product said it

24    contained all natural ingredients and didn't" -- what was

25    the question?  "Would you buy it if it contained" -- doesn't
```

1   that go to the heart of the matter?

2          MR. WEINBERGER:  I think what she should have

3   done, Your Honor, is she should have shown them the product.

4   She should have pointed them to whatever she wanted to -- to

5   the label, and she would have asked them -- given them

6   choices, a list of choices, including what was intended by

7   that, which is:  Are the active ingredients or the

8   sunscreen ingredients --

9          THE COURT:  Where does active ingredients show

10  itself on the product?

11         MR. WEINBERGER:  Actually, if you turn the product

12  around under -- in the back it says, "active ingredients:

13  Titanium dioxide, zinc oxide," which are the two naturally

14  sourced ingredients, and they say they're sunscreen.  So in

15  fact it does say that on the back of the product, but I'm

16  saying, from the point of view of the survey, again, one of

17  the clear maxims in Dr. Diamond's article is, when you give

18  someone choices, you have to give them the choice that is

19  the literal meaning of the claim.  She didn't do that.

20         THE COURT:  Why isn't it?  In other words, this

21  gets back to the first question:  What importance do you pay

22  to the label on the front as compared to some other part;

23  and if it is established that people focus on the front of

24  the label, then why are your arguments about what's on the

25  back of the label important?

```
1              MR. WEINBERGER:  Well, first of all, it isn't

2    established.  And second of all --

3              THE COURT:  Well, that's where we started.

4              MR. WEINBERGER:  And, second of all, Your Honor, I

5    don't want Your Honor to think that our only argument here

6    is:  The front is misleading.  You should have looked at the

7    back.  There -- even her own survey show that there is a, as

8    flawed as it was and as leading as it was, a very

9    substantial number of people who did not take away that

10   interpretation.  We don't know what interpretation they took

11   because she never gave them the opportunity to say it meant

12   that sunscreen ingredients.

13             THE COURT:  I didn't follow what you just said.

14             MR. WEINBERGER:  Okay.  So what the intention is,

15   with that phrase, is to tell people that it's a physical

16   sunscreen; that the ingredients that are actually providing

17   the protection from the sun are naturally sourced, and that

18   is not debated.

19             THE COURT:  But who cares what the intention is?

20   If I'm buying sunscreen I don't care what Neutrogena's

21   intention is.

22             MR. WEINBERGER:  No.  I'm saying there may be

23   people who understand that when they read it who are not

24   misled even just by reading the front of the package.

25             THE COURT:  They read the front of the package and
```

1   say what?

2           MR. WEINBERGER:  And they say the sunscreen

3   ingredients are naturally sourced.  The ingredients that

4   provide the protection from the sun are naturally sourced,

5   and that's a true statement.

6           THE COURT:  That, at a minimum, would be an issue

7   of fact.

8           MR. WEINBERGER:  I agree.  I agree.  I think

9   that's what Your Honor found in denying the motion to

10  dismiss.  We agree with that.

11          THE COURT:  But -- go on to another of your

12  contentions.

13          MR. WEINBERGER:  Okay.  So, again, none of these

14  in and of themselves would have been a basis for a Daubert

15  motion, but the other thing she did, she had a -- this is an

16  Internet survey and it's done on something called

17  "Mechanical Turks" -- people actually sign up to take

18  surveys to make money.  That's why they do these surveys.

19          So she asks them, she tells them before they start

20  the survey, "If you bought baby sunscreen, if you've bought

21  that, you can be in the survey.  Did you buy baby

22  sunscreen?"  Well, of course, anybody who wants to be in

23  that survey says "yes."

24          And that's not the proper way to screen

25  participants.

```
 1          You're supposed to screen them -- you either

 2   screen them after the fact or you give them a list.  "Have

 3   you ever bought baby sunscreen, shampoo," give them five

 4   things.  And if they've bought one of them, you exclude

 5   them, but you don't tell them in advance how they have to

 6   answer the question in order to get into it.

 7          THE COURT:  And what is your authority for that

 8   deficiency, other than your own expert?

 9          MR. WEINBERGER:  There are a variety of cases we

10   cited in our brief about a proper -- it leads to an improper

11   universe.  You don't get the people who are the prospective

12   purchasers when you do that.  You get people who want to

13   take the survey and want to earn the income.

14          Along the same lines, you don't ask people, "Have

15   you bought baby sunscreen" without asking them if they

16   bought it recently.  They could have bought -- I bought baby

17   sunscreen 37 years ago.  I shouldn't be a participant in

18   that survey.  And there are people who are expecting kids or

19   have a pregnant woman who may -- who's also someone who

20   should be in that survey.  Again, these -- these in and of

21   themselves are not fatal.  They're all recognized flaws and

22   --

23          THE COURT:  Why don't -- why couldn't the

24   plaintiff respond by saying that these issues that you're

25   raising go to the weight of the -- and not its --
```

1          MR. WEINBERGER:  And they often do.  They often

2     do.  This universe question goes to the weight.  The control

3     question often does not go to the weight.  There are cases

4     that we cited that basically say if you don't have controls,

5     you don't have a proper survey.  The leading questions can

6     go to the weight.  It's the cumulative effect of all of

7     them, and then when you add them to the fact that the survey

8     doesn't fit the facts, that she didn't survey the actual

9     package, we think that that makes the survey irrelevant and

10    unreliable and that it shouldn't be admitted.

11         THE COURT:  Let me stay with your last comment.

12    When you say the actual product, what is it that you think

13    the person conducting the survey should have done?

14         MR. WEINBERGER:  Should have done what any survey

15    expert who knows what they're doing should have done.  They

16    should have shown them the product, actually give -- or a

17    picture of the product.

18         THE COURT:  And then as they were, as the product

19    was displayed, what would the question be?

20         MR. WEINBERGER:  The questions can be -- I mean we

21    have problems with the questions and I'm not a survey

22    designer, but I've seen enough of them.  The questions could

23    have been -- could have been, you can direct someone to the

24    phrase that you're interested in.  "Looking at this phrase,

25    do you believe" and then give them a bunch of choices.

1          THE COURT:  Do you believe that all of the

2   ingredients are natural?

3          MR. WEINBERGER:  That would be one of the choices.

4          THE COURT:  Do you believe that only the active

5   ingredients are natural?

6          MR. WEINBERGER:  Correct.  That's --

7          THE COURT:  Do you believe some of the ingredients

8   are natural and some not?

9          MR. WEINBERGER:  Correct.  That's absolutely

10  correct.  That is how I think most survey experts would do

11  this.  That's certainly the ones that I've seen.

12          THE COURT:  Is that, in your view, a deficiency

13  that goes to the weight or the methodology?

14          MR. WEINBERGER:  Again, I think because she didn't

15  show them the package, the answer is yes and all these other

16  -- and didn't use a control.  Those two things separately

17  and together --

18          THE COURT:  What cases best support that argument?

19          MR. WEINBERGER:  Well, the control case, it was a

20  case called *American Home Products* against Proctor & Gamble

21  that I was personally involved in.

22          There's another case that we cited that cited

23  *American Home Products*.  I don't remember the name of it,

24  but *American Home Products* was one of the earlier ones.  It

25  was in 1995, and it has been followed by many courts on the

22

1    control.

2              On the issue of the package, we cited the *Scotts*

3    case in the Fourth Circuit where the court held the survey

4    was unreliable precisely because they didn't show the whole

5    context in which the claim at issue appear --

6              THE COURT:  Was that the case with the crab grass?

7              MR. WEINBERGER:  Yes.  Yes.

8              And there -- and there are other cases that we

9    cited for that -- for that proposition.  Those two

10   principles are fairly well established.

11             Now, I grant it, Your Honor, those are Lanham Act

12   cases where this issue primarily comes up in, it comes up

13   less frequently in these cases, but I think courts in the

14   consumer fraud cases have generally followed the Lanham Act

15   cases when it comes to survey design.

16             THE COURT:  Now, do you want to respond, sir, in

17   some way?

18             MR. IZARD:  Briefly, if I may, Your Honor.

19             THE COURT:  Yes.

20             MR. IZARD:  First, Your Honor, I think it's

21   important, you know, to look carefully at the declarations

22   that have been filed by the experts rather than just listen

23   to the lawyers because I think that that is the real core

24   here of how, at least I think, would be appropriate to look

25   at this.

1        And the defendants' expert cites no authority for

2   anything.  It's basically his unsubstantiated supposition.

3        I mean defense counsel mentioned the use of the

4   mechanical turks survey device.  Well, you know, the defense

5   expert said, "I don't use mechanical turk."  He never raised

6   a problem with it.  He never said that he disagreed with any

7   of the plaintiffs' experts' conclusions.

8        On the various points that defense counsel raised,

9   for example, about leading questions.  Well, our expert

10   cites an authoritative source, the Diamond article defense

11   counsel mentioned that says using closed-end questions for

12   this type of a survey are appropriate.

13        Our expert says on the issue of controls for bias

14   that that's appropriate when you're in a false advertising

15   case where you're comparing Advil and Tylenol, where a

16   survey participant comes in with preconceptions about how

17   Advil works or how Tylenol works but, in her opinion, and,

18   again, she does this all the time, her opinion is when

19   you're just testing English words without the bias behind

20   it, such as the Advil brand, that it's appropriate just to

21   test the words.  And their defense expert doesn't cite any

22   authoritative source disagreeing with that.

23        On the issue of survey participant self-qualifying

24   or being paid or knowing what the survey is about, well,

25   that's true of any survey.  I mean I get called at my house

1    and they ask me a few questions.  That's the way surveys

2    work.  People participate in surveys, and they're paid to do

3    it.

4              So I think a lot of this is kind of

5    unsubstantiated battle of the experts, and it does go to

6    weight.  We think that our expert -- and if you read the

7    three declarations, we hope the court will find that our

8    expert has the weight heavily on her side.

9              THE COURT:  What if you didn't have an expert,

10   could you make the same arguments that you're making now?

11   Are you dependent on the expert?

12             MR. IZARD:  Well, we think it helps.  To be

13   honest, we --

14             THE COURT:  Well, sure.  What if you just couldn't

15   afford one and you were here without an expert, could you --

16   why couldn't you make the same arguments that you've been

17   making all along?

18             MR. IZARD:  Well, we believe we could, and we

19   believe that the documents attached --

20             THE COURT:  I'm talking about the case law that

21   you mentioned.

22             MR. IZARD:  Yes.

23             THE COURT:  Was it the *Williams* case?

24             MR. IZARD:  *Williams* is the Ninth Circuit case

25   that says you don't look at the back --

1      THE COURT:  That's what I was referring to.  So if

2  that case says you don't have to look at the back if the

3  front of the label is arguably misleading, then -- we know

4  that the product didn't contain all natural ingredients.

5      MR. IZARD:  Yeah.

6      THE COURT:  And there are some people out there

7  who place an importance on natural ingredients.

8      MR. IZARD:  I don't think that the expert's

9  opinion is essential when you combine, particularly, the

10  documents that I referred to earlier from the Veno exhibit.

11  Since we retained our expert, the *Stockwell* case has come

12  down, which took the notion of materiality in a class cert

13  case out of the securities context, which was what the

14  Supreme Court decision in *Amgen* was about, and applied it to

15  a disparate impact case.  So I don't think it's critical.

16  When we hired the expert, we hadn't had the discovery, and

17  we hadn't had *Stockwell*.  That being said, I think our

18  expert has done a fine job and her methodology is fully

19  consistent with Daubert.  And I think if, again, if you

20  compared the plaintiffs' expert declaration with the

21  defendants' expert declaration, the court will conclude that

22  at best we're talking about experts back and forth.  You

23  know, this is really quite a bit different from the *Scotts*

24  crab grass case.

25      THE COURT:  I know the difference.  Let's get to

1    something else.

2            Did you want to go to Rule 23?

3            Go ahead.

4            MR. WEINBERGER:  Your Honor, we think that this

5    motion fails for a number of independent reasons, and I'm

6    going to go a little bit different order than I thought I

7    was.

8            The first issue I want to talk about is the choice

9    of law issue because I know Your Honor is familiar with

10   this.

11           THE COURT:  Now, here's what I'm inclined to do.

12   I'm inclined to defer the certification of a nationwide

13   class until I resolve the question of the California class;

14   so the choice of law question becomes less important at this

15   moment.

16           MR. WEINBERGER:  All right.  So I will skip that

17   for now, and I will turn to why you shouldn't -- actually, I

18   don't want to be overly technical -- there's been no motion

19   for California class here.  The motion was for a nationwide

20   class from multi-state class consisting of 21 states where

21   they said the law was the same --

22           THE COURT:  Is that true?  Maybe I assumed

23   something I shouldn't have.

24           Counsel, there's no motion for a California class?

25           MR. IZARD:  Your Honor, we -- not a pure

1  California class.  We had a number of different variations

2  but one is for separate classes for the states in which each

3  plaintiffs live and one of those states is California.

4         MR. WEINBERGER:  It could be ambiguous.  I read

5  this as being a nationwide class, a 21-state class or a

6  three-state class consisting of California, Massachusetts

7  and Michigan.

8         THE COURT:  Let me ask the plaintiff this:  Would

9  I be inconsistent with your view if I considered a

10  California class?

11        MR. IZARD:  No, Your Honor, frankly, I think that

12  would cover most of the issues.

13        THE COURT:  I see.  All right.  Then I am going

14  to.

15        MR. WEINBERGER:  Okay.  So let me address the

16  issue of why California class should not be certified, and I

17  think the primary reason -- I think there are a couple of

18  grounds but the primary reason is there's been no showing

19  here that they have the method that's capable of proving

20  injury on a class-wide basis.

21        To give you a little history.  When we got

22  Your Honor's order requiring that the motion be made in 90

23  days, we were asked to provide some discovery to the

24  plaintiffs on an expedited basis, which we did.  We gave

25  them what they asked for.  We gave them a couple of

1  depositions.  They made their motion, and in their motion

2  they did not say anything about injury.  They said, "We're

3  going to prove" --

4          THE COURT:  Well, that's a separate issue and one

5  that the court has to consider whether in terms of the

6  damage requirement the court can accept the representation

7  that a damage model will likely be successful --

8          MR. WEINBERGER:  Right.

9          THE COURT:  -- based upon what the expert said, as

10  contrasted to an actual model which hasn't been presented;

11  and, in that regard, it's my view that the Court has some

12  discretion, and courts have gone different ways in that

13  regard -- I think most recently one of my colleagues, Judge

14  Snyder, found that a model was important.

15          MR. WEINBERGER:  Yeah.  And I would go to *Comcast*

16  because what *Comcast* said is it's not enough to offer any

17  method of measurement so long as it can be applied class

18  wide no matter how arbitrary the measurements may be.  And

19  went on to find that if you simply accepted any measurement

20  without some assurance that it is likely to demonstrate a

21  class-wide method of injury, you render that requirement a

22  nullity.

23          THE COURT:  But the plaintiff says it has because

24  its expert has said for these reasons when we get to a

25  damage calculation it's going to pass muster.

```
 1              MR. WEINBERGER:  Well, first of all, he says it's
 2    a hypothesis, and he says he has to prove it.  He says he
 3    thinks he will, but he has to prove it.  So he hasn't really
 4    done that, but this is about as bare bones presentation as
 5    you can possibly imagine.  What the gentleman did was take a
 6    text book off the shelf and say, "There's a method here
 7    called Tectonic Regression, and there's another one called
 8    the Conjoint Analysis and I think, you know, if I get all
 9    the data that I think I need and I figure out what I have to
10    look at, what variables I have to look at, I think it will
11    come out okay."
12              Well, that's just not enough, and I think even --
13              THE COURT:  Isn't that opinion buttressed to some
14    extent by some of the discovery that the plaintiff has
15    obtained from the marketing files --
16              MR. WEINBERGER:  No.
17              THE COURT:  -- of Neutrogena?
18              MR. WEINBERGER:  He hasn't even told us what he
19    thinks he has to look at.
20              Let me contrast this.  They gave you a case, Your
21    Honor, with their last memorandum.  Their -- I don't know --
22    their surreply memorandum.  The Werdebaugh case, the Blue
23    Diamond case that Mr. Izard referred to.  There was an -- in
24    that case, they allowed the expert -- they found the expert
25    testimony to be sufficient, and what the expert did in that
```

1    case was he said the product involved was on the market at a

2    time when the claim was not being made.  I'm going to look

3    at the pricing of that product at the time that the claim

4    was not made.  I'm going to compare it to the pricing of the

5    product at the time that the claim was made, and then I'm

6    going to do a regression to account for all the other things

7    that might have impacted that price.  So he gave a method.

8              In distinguishing a case in which that very same

9    expert's report had been rejected in another case, the court

10   said -- this is the case that they gave you -- that that

11   expert's proposed model was not sufficiently developed to

12   meet plaintiff's burden of showing that common questions

13   predominate over individual ones noting -- further noting,

14   quote:

15              "Courts are increasingly skeptical of

16              plaintiffs' experts who offer only generalized and

17              theoretical opinions that a particular methodology

18              may serve this purpose without also submitting a

19              functioning model that is tailored to meet the

20              facts in this case."

21              And that's exactly what this gentleman did not do.

22   He did nothing.  He doesn't tell -- they don't have a prior

23   product to compare it to, but in order to do what he has to

24   do, he has to look at a whole variety of other products that

25   are similar, but -- he hasn't told us anything.

1          THE COURT:  To make sure I have your -- your view

2     in mind, you would argue then that the motion as now

3     constituted ought to be denied without prejudice to the

4     plaintiff providing a model?

5          MR. WEINBERGER:  No, I don't think so.  I think --

6          THE COURT:  You think it ought to be denied for

7     all time sake?

8          MR. WEINBERGER:  I think they had -- they've had

9     two bites at this apple.  They've gotten discovery from us.

10         By the way, in one of his declarations he said,

11    "What I'm going to get is prices of competitive products

12    from the -- from the defendant."  We don't have prices of

13    competitive products.  That information is available through

14    a service called IRI.  They've just gotten around to

15    subpoenaing IRI a couple of weeks ago.  Our expert got that

16    material months ago, and they could have gotten it months

17    ago.

18         I think, also, but there are reasons why -- if I

19    could have a couple of minutes -- denying -- denying the

20    motion without prejudice we don't think ultimately is going

21    to accomplish anything anyway because we don't think that he

22    can demonstrate what he has to demonstrate.

23         In the first place, all of the problems that our

24    expert identified in terms of the facts, that the prices of

25    these products are different everywhere.  They're different

1   all over the country.  They're different in different

2   classes of --

3            THE COURT:  You mean the prices of this product?

4            MR. WEINBERGER:  Both.  Both competitive products

5   and these products are -- they vary all over the map.  And

6   in fact we demonstrated in that declaration that not only is

7   there no systematic price premium, there's some places where

8   it's in reverse.  Where in fact the Neutrogena product is

9   less than what was alleged to be comparable products.

10           So he's going to run -- when he decides to tell us

11  what he's going to do, which he hasn't done, he's going to

12  run into that problem.

13           THE COURT:  Why should he be denied that

14  opportunity at this stage?

15           MR. WEINBERGER:  Well, because, frankly,

16  Your Honor, Your Honor required that this motion be made

17  within 90 days.  They got discovery from us, they had every

18  opportunity to hire an expert --

19           THE COURT:  Was it made within 90 days?

20           MR. WEINBERGER:  It was made on the 90th day.

21           THE COURT:  But, you know, that 90-day rule is not

22  to be ignored but in practice it is ignored more than it's

23  followed and it sounds like you're quite experienced in this

24  area.  You know that most courts almost without cause extend

25  that 90 days.  So it isn't as though the plaintiff has had

```
 1   years and --

 2              MR. WEINBERGER:  No.

 3              THE COURT:  -- came up dry.

 4              Let me just cut this short a bit.  Not because I

 5   don't want to hear your arguments because I do have a sense

 6   of where I'm inclined to go.  I'm not inclined to grant -- I

 7   am inclined to think that there are deficiencies in the

 8   motion, but I am inclined and I'm going to re-examine some

 9   of the authorities in light of the discussion; so this is

10   far from conclusive, but I am inclined to think that at a

11   minimum the plaintiff ought to have an opportunity to

12   provide a model.

13              In other words, I think that Judge Snyder had the

14   correct analysis and -- so that is my inclination.

15              If I were to follow through on that, let me ask

16   plaintiff how much time would you need if I found that you

17   have to provide a model.

18              MR. IZARD:  Well, Your Honor, there -- one

19   outstanding issue is some of the documents that we're

20   waiting for from the defendant.  Once our expert gets all

21   the data, he can run it in a couple of days, because it's

22   basically an off-the-shelf software.  It's a standard

23   regression much like the type of regression that's done in a

24   securities study where, you know, analyze the relative

25   values and weights.  So all he needs to do is get the data
```

34

 1    and plug it into the program.  This is a regression analysis

 2    he learned in college; so this is not some unique thing --

 3           THE COURT:  But you know in a regression analysis

 4    in a securities case, an expert can go through all the

 5    factors and account for them, but if the price of IBM stock,

 6    as an example, dropped from 100 to $2 overnight and there

 7    was a regression analysis but, at the same time, the night

 8    before World War III was declared, how relevant would the

 9    regression analysis be?

10           MR. IZARD:  I think if I could respond to what I'm

11    hearing, Your Honor --

12           THE COURT:  He seems to be saying that there's a

13    World War III here in that the pricing structure is ad hoc.

14    Isn't that what you're saying?

15           MR. WEINBERGER:  Well, yeah.  The defendant does

16    not fix the prices for which retailers charge customers and

17    they're all over --

18           THE COURT:  You know, I don't want to get into the

19    merits of that because we're wasting time.  Obviously, this

20    is something I'm not going to decide on the fly.

21           So what I'm going to do is probably issue an order

22    along the lines I've now suggested.  The only open issue is

23    how much time you ought to have, and I'll ask you how much

24    time do you want to file a model?  And then I will give --

25    once you file a model, I'll grant the defendant an

1   opportunity to file a further pleading.

2          MR. IZARD:  Assuming -- and this relates to the

3   Rule 16 motion --

4          THE COURT:  Yes.

5          MR. IZARD:  -- assuming we can get the information

6   relating to sales and the attributes that Neutrogena

7   considers important within the next month, we would like two

8   months to file.

9          THE COURT:  All right.  Then I'll give you two

10  months.  I'll give you 60 days.

11         MR. IZARD:  Thank you, Your Honor.

12         THE COURT:  And then following that, I'll give you

13  ten days to file a further opposition.

14         MR. WEINBERGER:  Could I ask, Your Honor, if

15  you're going to give him permission, could we take the

16  deposition of the expert so we can flush out what he's

17  saying in whatever he does before we submit --

18         THE COURT:  All right.  You can.

19         MR. WEINBERGER:  So can we have 20 days?

20         THE COURT:  All right.  Then I'll give you a

21  month.

22         MR. WEINBERGER:  Okay.  Thank you.

23         I have some more arguments but my sense --

24         THE COURT:  No, it's not that I don't want to hear

25  them.  I think that I'd rather have the plaintiff have an

```
1   opportunity and not foreclose that especially given that we

2   haven't been at this for years.  Okay.  Thank you.  Thank

3   you for your arguments.

4            MR. WEINBERGER:  Thank you.

5            MR. IZARD:  Thank you.

6            THE COURT:  I'll issue a minute order to be more

7   precise.

8                 (Thereupon, proceedings adjourned)

9

10                        -oOo-

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3

*CERTIFICATE*

4

5

6          *I hereby certify that pursuant to Section 753,*

7   *Title 28, United States Code, the foregoing is a true and*

8   *correct transcript of the stenographically reported*

9   *proceedings held in the above-entitled matter and that the*

10  *transcript format is in conformance with the regulations of*

11  *the Judicial Conference of the United States.*

12

13  *Date:  August 11, 2014*

14

15                              *Lisa M. Gonzalez*
                    */s/_____*
16                  *Lisa M. Gonzalez, U.S. Court Reporter*
                    *CSR No. 5920*
17

18

19

20

21

22

23

24

25